UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| ROBINSON MECHANICAL | ) | |
|---|---|---|
| CONTRACTORS INC. d/b/a ROBINSON | ) | |
| CONSTRUCTION COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:15-CV-77 SNLJ |
| | ) | |
| PTC GROUP HOLDINGS CORP., and | ) | |
| PTC SEAMLESS TUBE CORP., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

This case comes before the Court on defendant PTC Group Holdings Corp.'s ("PTC") motion to dismiss counts I, II, VI, and VII of plaintiff's second amended complaint (#81). Plaintiff Robinson Mechanical Contractors Inc. d/b/a Robinson Construction Company ("plaintiff") opposes the motion. Defendant PTC Seamless Tube Corp. ("Seamless"), a dissolved and defunct corporation able to sue and be sued under Delaware law, is not represented in this action and is currently in default. The issues are briefed and ripe for disposition.

**I.     Background**

Plaintiff filed this lawsuit against defendant PTC on May 5, 2015. Plaintiff performed extensive construction work at a PTC's subsidiary's steel tubing manufacturing plant in Hopkinsville, Kentucky, pursuant to a contract between plaintiff and a PTC subsidiary, Seamless. When the PTC subsidiary – Seamless – fell behind on

paying its invoices from plaintiff, PTC stepped in and made some payments pursuant to a new letter agreement between PTC and plaintiff dated December 16, 2014, for invoices due by the end of December 2014.  PTC made the payments discussed in the letter agreement but made no payments for future work done by plaintiff for Seamless.  In fact, after the payments made by PTC in accordance with the letter agreement, neither Seamless nor PTC made any payments to plaintiff for plaintiff's work after November 23, 2014.

Due to the claims presented and complexity of the matter, the Court will expand on the details of plaintiff's allegations.  Plaintiff alleges that PTC created Seamless to make and sell seamless piping to complement PTC's existing business.  PTC purchased pipe manufacturing equipment and decided to transform an existing facility owned within PTC's corporate family, located in Hopkinsville, into a seamless pipe business.  PTC Alliance Acquisitions ("PTC Alliance"), another corporation within PTC's corporate family, entered into a Professional Services Agreement ("PSA") with plaintiff to remove the equipment currently at the facility.[1]  Seamless was incorporated on June 24, 2013, approximately a month and a half after plaintiff entered into the contract with PTC Alliance.  After incorporation, PTC purchased all of Seamless' shares of stock for $10. PTC's CFO was the sole initial director for Seamless and eventually was named the CFO and vice president of Seamless.  The CFO then nominated the CEO and president of PTC to become the second director of Seamless, in addition to being named the CEO and

---

[1] Plaintiff claims that the additional statements of work, which incorporated the PSA entered into by plaintiff and PTC Alliance, stated that plaintiff was dealing with "PTC Seamless Tube Corp f/k/a PTC Alliance Pipe Acquisition LLC."  Plaintiff did not know that these were two separate corporate entities.

president of Seamless. Plaintiff alleges that these two were Seamless' only directors and officers from Seamless' incorporation until its bankruptcy. Additionally, Seamless and PTC shared the same physical address and offices.

Seamless, plaintiff claims, was created by PTC to be the contracting party with contractors and suppliers for construction and renovation of the Hopkinsville facility as a means to shield PTC from liability for the project. In late November or early December 2013, PTC representatives met with plaintiff and asked plaintiff to perform the overall work on the renovation of the Hopkinsville plant, including the installation of the equipment on a time and material basis.[2] As stated above, plaintiff entered into the PSA with Seamless, not PTC. However, PTC representatives were frequently on-site controlling and directing the construction and renovation work. Plaintiff invoiced Seamless every two weeks for its work with payment due 30 days following invoice. By the end of November 2014, Seamless owed plaintiff more than $7 million for plaintiff's work at the Hopkinsville plant.

Due to financial issues, PTC, on behalf of Seamless, sought to alter the payment terms of the PSA, including extending the due date for invoices from 30 days to 90 days. At the same time, PTC representatives indicated that they were happy with plaintiff's work and wished plaintiff to work on "Phase II" of the project. Plaintiff, owed over $7 million by Seamless under the current PSA, was hesitant about extending the invoice due date. PTC, in an effort to ease plaintiff's concerns, submitted a copy of its financial statement from September 2014 and a document entitled "Summary Borrowing Base

---

[2] This portion of the construction work is referred to as "Phase I" by the parties.

Certificate" which indicated an amount of approximately $23.5 million available under PTC's credit facilities with that amount represented to plaintiff as available to pay plaintiff for its continuing work on the Hopkinsville plant. After receiving this information, on December 16, 2014, plaintiff entered into a letter agreement with PTC which stated, *inter alia*, that (1) PTC would pay plaintiff for invoices through PTC's central cash management system, (2) plaintiff would extend the invoice due date from 30 to 90 days, (3) and plaintiff would complete Phase II of the project.

PTC made the payments for past-due invoices according to the terms of the letter agreement. Following PTC's payment, plaintiff continued to work on the project with project activities and staffing levels directed by on-site PTC representatives. Plaintiff's first invoice after the letter agreement covered work between November 23, 2014 and December 6, 2014, with the invoice given to PTC and Seamless on December 12, 2014. Because of the 90 day due date, payment for this invoice was not due until March 12, 2015.

On March 11, one day before Seamless' payment was due pursuant to the letter agreement, nearly three months after the defendants were given plaintiff's invoice, Seamless sent a letter to plaintiff advising plaintiff that Seamless had a dispute regarding plaintiff's invoice and that it would not make the payment. The letter did not refer to any particular invoice and did not explain what Seamless disputed within the invoice. Further, this was the first time that defendants advised plaintiff that defendants disputed plaintiff's invoices or would not pay plaintiff's invoices. Plaintiff ceased work on March 12. Plaintiff alleges that the parties met in-person several weeks after the payment

4

dispute and defendants again declined to identify any particular invoices or items within invoices that defendants disputed.

Since then, neither Seamless nor PTC has paid plaintiff for its work done after November 23, 2014. Insolvent or approaching insolvency, Seamless applied for bankruptcy on April 26, 2015 and was dissolved, pursuant to Delaware law, on January 29, 2016 (#68-3).[3] Ultimately, plaintiff claims that it is owed $14.8 million for labor and materials that it and its subcontractors furnished for the construction project. Despite the fact that plaintiff had a contract with the PTC subsidiary – Seamless – plaintiff filed its first amended complaint solely against PTC on the basis of the 2014 letter agreement between PTC and plaintiff. Plaintiff brought six claims against PTC – (1) breach of contract, (2) breach of duty of good faith and fair dealing, (3) fraudulent misrepresentation, (4) negligent misrepresentation, (5) promissory estoppel, and (6) quantum meruit.

PTC moved to dismiss plaintiff's first amended complaint for failure to state a claim. The Court partially granted PTC's motion on March 31, 2016 – dismissing three of plaintiff's claims including breach of contract, breach of duty of good faith and fair dealing, and quantum meruit (#27). The parties then engaged in discovery. The case management order set a deadline for amendment of pleadings and joinder of additional parties of September 30, 2016 (#33). Due to ongoing depositions, plaintiff requested and received an extension of time for that deadline to October 31, 2016 (#38). Plaintiff filed

---

[3] In bankruptcy, Seamless listed secured obligations of "approximately $178 million and unsecured obligations of approximately $118 million for a total amount of nearly $300 million of debt, in addition to other obligations it owed to its various vendors and contractors such as Robinson." Pl. Second Am. Compl. ¶ 54.

a motion to file a second amended complaint on October 31, seeking to add Seamless as a defendant, to add a new count to pierce the corporate veil between Seamless and PTC, and to reassert counts previously dismissed based upon new allegations in light of facts discovered since the filing of the first amended complaint (#40). The Court granted the plaintiff's motion on January 27, 2017 (#65).

Now, plaintiff seeks to pierce Seamless' corporate veil because plaintiff alleges that PTC and its wholly-owned subsidiary, Seamless, acted as a single economic entity and are alter egos – subject to liability for plaintiff's claims. Seamless failed to answer plaintiff's second amended complaint and is currently in default in this action (#97). In the instant motion, PTC again seeks to dismiss plaintiff's breach of contract, breach of duty of good faith and fair dealing, and quantum meruit claims, in addition to plaintiff's new claim to pierce the corporate veil between Seamless and PTC (#81).

## II. Legal Standard

The purpose of a Rule 12(b)(6) motion to dismiss for failure to state a claim is to test the sufficiency of a complaint so as to eliminate those actions "which are fatally flawed in their legal premises and deigned to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity." *Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir. 2001) (citing *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989)). "To survive a motion to dismiss, a claim must be facially plausible, meaning that the 'factual content. . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Cole v. Homier Dist. Co., Inc.*, 599 F.3d 856, 861 (8th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court must "accept the

allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party." *Id.* (quoting *Coons v. Mineta*, 410 F.3d 1036, 1039 (8th Cir. 2005)).

### III. Analysis

#### A. Breach of Contract

The breach of contract count is based on the letter agreement dated December 16, 2014 between plaintiff Robinson Construction and defendant PTC.[4] This Court, by order of March 31, 2016, dismissed that count for failure to state a cause of action. Now, with leave of Court, plaintiff has refiled the count, which is essentially the same as the original, but with the addition of allegations pertaining to the oral negotiations between the parties that led to the agreement. These new allegations, of course, are parol evidence, which is disallowed unless the Court determines that the contract is ambiguous. In that event, parol evidence is permitted to determine the intent of the parties. *Dunn Indus. Grp. V. City of Sugar Creek*, 112 S.W.3d 421, 428-29 (Mo. banc 2003); *Royal Banks of Missouri v. Fridkin*, 819 S.W.2d 359, 361-62 (Mo. banc 1991).[5]

Whether the contract is ambiguous so as to permit parol evidence was not an issue addressed by the parties in the briefing on the first motion to dismiss, and for that reason, this Court is compelled to revisit the dismissal. For context, this Court's reasons for the dismissal in the March 31, 2016 memorandum and order are restated as follows:

---

[4] A copy of the letter agreement is attached as an appendix.
[5] The parties generally agree that the letter agreement is in the nature of a guarantee, and the dispute is over the extent of the guarantee. Although defendants, citing *Capitol Grp., Inc. v. Collier*, S.W. 3d 644, 648 (Mo. App. 2012), maintain that guaranties are "strictly construed according to the terms of the guaranty agreement and may not be extended by implication beyond the strict letter of the obligation," this rule is applied only after that obligation is determined in the first place, using the rules of construction applicable to all contracts. *See Royal Banks,* 819 S.W. 2d at 361-62.

7

Plaintiff is clear, in its complaint and in its response to defendant's motion, that its claims against defendant arise from the letter agreement that is independent of and "does not incorporate the terms . . . of the [PSA] with Seamless." Plaintiff argues that defendant agreed to pay for the future debts of Seamless, its wholly owned and controlled subsidiary, to Robinson through its own cash management system. Plaintiff relies primarily on the following statements in the letter agreement:

> As we agreed, you released payment of $1,749,974.00 on Friday 12-12-14, receipt of which is hereby acknowledged and we will accept payment of the balance of $6,190,472.42 on January 2, 2015 by wire transfer in return for the concessions below. As a part of this agreement we would also be willing to extend your payment terms for all invoices sent after December 1, 2014 to 90 days.
>
> . . .
>
> Payments made on behalf of PTC Group Holdings Corp. and its subsidiaries, including PTC Seamless Tube Corp, are paid by PTC Group Holdings through its central cash management system.

Under these provisions, the only payment defendant agreed to make was for the outstanding balance owed by Seamless to plaintiff for work billed in October and November by January 2, 2015. Although the foregoing provisions also state the method of payment for the outstanding balance that defendant agreed to pay, it does not constitute a promise by defendant to guarantee or make future payments owed by Seamless.

The letter agreement, standing alone, is a contractual agreement for defendant to pay the balance Seamless owed for work billed in October and November 2014 by January 2, 2015. The parties agree that occurred. Plaintiff's breach of contract claim alleging defendant was required to make future payments owed by Seamless is not supported by the plain language of the letter agreement. In the letter agreement defendant agreed to pay $7,940,446.42 owed by Seamless to plaintiff as of December 30, 2014. The amount due was to be paid in two payments. Defendant agreed to make the payments to plaintiff from its central cash management system. Plaintiff agreed to extend payment terms for all invoices sent after December 1, 2014 from 30 days to 90 days. But nowhere in the letter agreement does defendant commit to pay, or guarantee payment of, those invoices for Seamless. Plaintiff's breach of contract claim, therefore, fails to state a claim and defendant's motion to dismiss this claim will be granted.

Naturally, defendants agree with the foregoing analysis. On the other hand, plaintiff parses the letter differently in order to prove that the intention of the parties was in fact that PTC guarantee future payments owed to plaintiff by Seamless, or at least to prove that the letter is ambiguous. In particular, plaintiff points to the provision that, "As a part of this agreement we would also be willing to extend *your* payment terms for all invoices sent after December 1, 2014 to 90 days." (emphasis added). Use of the word, "your," then, apparently refers to an extension in favor of PTC, rather than Seamless, because the only signatories to the letter agreement are Robinson and PTC, not Seamless. To the contrary, PTC argues that the words, "your payment terms," is necessarily a reference to Seamless alone, because the only contract to which the payment terms could be addressed was that between Robinson and Seamless. But the next paragraph clarifies that, "We need you to understand that this extension of credit *to PTC* does require the commitment of a significant portion of our available line of credit for *your* use and that failure to pay *on the part of PTC* would be disastrous to Robinson Construction." (emphasis added). If indeed the extension of credit is to the benefit of PTC, then it is implicit that PTC will make the future payments on the project. The reason is that Robinson would have no need to extend credit expressly to PTC if PTC were not obligated to pay. All that said, though, the fact remains that there is no express promise by defendant to guarantee future payments, hence an ambiguity arises.

Plaintiff also focuses on the provision that, "Payments made on behalf of PTC Group Holdings Corp. and its subsidiaries, including PTC Seamless Tube Corp., are paid by PTC Group Holdings through its central cash management system." Because

9

"Payments" is couched in the plural, and because only one payment was still outstanding when the letter agreement was signed (the $6,190,472.42 due January 2, 2015), plaintiff contends that "Payments" must refer not only to the one outstanding payment, but to all future payments when due as well. Although as this Court observed in the previous order, this provision merely states the method of payment for the outstanding balance that defendant agreed to pay, there is an ambiguity as to which payments are to be made.

Ultimately, as to the obligation to make future payments on the project, the intention of the parties is unclear. Given the ambiguities presented, parol evidence is admissible to resolve those ambiguities. In its second amended petition on the claim for breach of contract, Robinson alleges in some detail the oral negotiations leading to the letter agreement. Suffice it to say that these new allegations do make clear that the intention of the parties was that PTC was to make the future payments, though it must be pointed out as well that PTC would proffer its own parol evidence showing that the intention of the parties was just the opposite. In any event, the breach of contract claim – with the addition of parol evidence – does state a cause of action, and as a result, the motion to dismiss that claim is denied.

### B. Veil-Piercing Claim

"It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation . . . is not liable for the acts of its subsidiaries." *U.S. v. Bestfoods*, 118 S.Ct. 1876, 1884 (1998) (internal citation omitted). "Limited liability is the rule, not the exception." *Anderson v. Abbott*, 321 U.S. 349, 362 (1944). Although limited liability is the general rule, there is an equally important principle of

corporate law that applies to the parent-subsidiary relationship "that the corporate veil may be pierced and the shareholder held liable for the corporation's conduct when, *inter alia*, the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the shareholder's behalf." *Bestfoods*, 118 S.Ct. at 62.

The parties dispute which state's law applies to its veil-piercing claim – plaintiff claims that Missouri state law applies while PTC contends that Delaware state law applies. But in that determination, even Missouri courts would hold that Delaware law applies. Missouri Courts apply the "internal affairs" doctrine when requested to pierce the corporate veil "because such requests necessarily involve 'an analysis of how the controlling shareholders administered and governed the corporation.'" *R & K Lombard Pharmacy Corp. v. Med. Shoppe Int'l, Inc.*, 4:07-CV-288 CEJ, 2008 WL 648509, at *3 (E.D. Mo. Mar. 5, 2008) (quoting *In re Bridge Info. Sys., Inc.,* 325 B.R. 824, 830-31 (E.D. Mo. Bankr. 2005)). "The internal affairs doctrine provides that the law of the state of incorporation should be applied to disputes regarding the internal organization of a corporation." *Id.* (citing *Yates v. Bridge Trading Co.,* 844 S.W.2d 56, 61 (Mo. App. 1992)). *See also American Recreation Products, Inc. v. Novus Products Co., LLC*, 4:06-CV-258 DJS, 2006 WL 3247246, at *2 (E.D. Mo. Nov. 8, 2006). Accordingly, because both defendants are Delaware corporations, Delaware's state law applies to plaintiff's veil-piercing claim.

To state a veil-piercing claim under Delaware law, a plaintiff must "plead facts supporting an inference that the corporation, through its alter-ego, has created a sham

entity designed to defraud investors or creditors."[6] *Doberstein v. G-P Indus., Inc.*, CV 9995-VCP, 2015 WL 6606484, at *4 (Del. Ch. Oct. 30, 2015) (quoting *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003)). Delaware courts consider five factors when deciding whether to disregard the corporate entity, including: "(1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder." *Id.* (internal quotation omitted).[7] No single factor is dispositive, and generally there must be some combination of them, and there must be "an overall element of injustice or unfairness" present. *Id.* The injustice, or unfairness, must "be found in the defendants' use of the corporate form." *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F.Supp. 260, 269 (D. Del. 1989). *See also Doberstein*, 2015 WL 6606484, at *4 ("[the] wrongful acts must be tied to the manipulation of the corporate form in order to make veil-piercing justifiable on the grounds of equity.")

The above factors apply all the more in the context of a wholly-owned subsidiary and its parent corporation. When "assessing whether to disregard the corporate form, Delaware courts consider whether there has been a showing that the parent/subsidiary

---

[6] Under Delaware law, the terms "piercing the corporate veil" and stating a claim under an "alter ego theory" are used interchangeably. *Vepco Park, Inc. v. Custom Air Services, Inc.*, CV 14C-09-018 RBY, 2016 WL 1613654, at *2-3 (Del. Super. Ct. Feb. 25, 2016) (internal citation omitted).

[7] Both parties cite the seven-factor test laid out in *United States v. Pisani*, 646 F.2d 83 (3d Cir. 1981), or other federal cases that cite *Pisani*, as the multi-factor test by which a court may determine the sufficiency of a veil-piercing claim under Delaware law. Although the federal test held in *Pisani* may be compatible with Delaware veil-piercing law, this court is of the opinion that the factors used by Delaware state courts are more appropriate in this action because plaintiff presents no federal cause of action. *See Fid. Nat'l Info. Services, Inc. v. Plano Encryption Techs., LLC,* CV 15-777-LPS-CJB, 2016 WL 1650763, at f.n. 6 (D. Del. Apr. 25, 2016)

relationship would work an element of fraud, injustice, or inequity." *Fid. Nat'l Info. Services, Inc. v. Plano Encryption Techs., LLC,* CV 15-777-LPS-CJB, 2016 WL 1650763, at *4 (D. Del. Apr. 25, 2016) (citing *Mason v. Network of Wilmington, Inc.*, No. CIV.A. 19434-NC, 2005 WL 1653954, at *3 (Del. Ch. July 1, 2005)). The factors are examined to determine whether "two entities appear to be legally distinct entities." *Id.* If the entities "effectively operated as one company" then "they must be treated as a single entity to avoid fraud or a miscarriage of justice." *eCommerce Inds., Inc. v. MWA Intelligence, Inc.*, CV 7471-VCP, 2013 WL 5621678, at *28 (Del. Ch. Sept. 30, 2013).

In its second amended complaint, plaintiff alleges that four of the five factors support its veil-piercing claim.[8] PTC disputes this claim, countering that the defendants' conduct was "typical of a majority shareholder or parent corporation." Again, at this stage of the proceedings, this Court must take plaintiff's factual allegations as true.

### 1. Undercapitalization

"[T]he inquiry into corporate capitalization is most relevant for the inference it provides into whether the corporation was established to defraud its creditors or other improper purpose such as avoiding the risks known to be attendant to a type of business." *In re Opus East, LLC*, 528 B.R. 30, 59 (Bankr. D. Del. 2015) (internal citation omitted). Plaintiff claims that PTC rendered Seamless undercapitalized at its inception and failed to sufficiently capitalize Seamless throughout its existence. As evidence, plaintiff alleges that: (1) PTC owned all of the capital stock of PTC Seamless and purchased that stock for only $10; (2) Seamless had no funds, income, capital, or assets, outside of PTC's funds,

---

[8] It appears that plaintiff does not allege that PTC siphoned any of Seamless' company funds because plaintiff alleges that Seamless had no funds of its own for PTC to siphon.

income, capital, or assets, which PTC could choose to withhold at any time; and (3) PTC burdened Seamless with $195 million in debt and pledged any assets Seamless may acquire to PTC's lenders. PTC disagrees and claims that PTC's board of directors made loans of $63.7 million to Seamless, and therefore Seamless was adequately capitalized when formed. Further, PTC opposes plaintiff's argument that Seamless' $195 million in debt evidences undercapitalization on the grounds that Seamless was merely "an obligor" of the debt, as compared to the sole obligor of the debt, and that Seamless could have sought indemnification from other co-obligors.

Under Delaware law, a parent corporation does not have a mandatory ongoing duty to provide sufficient capitalization for a subsidiary. *In re Opus East*, 528 B.R. at 65. However, even if Seamless was initially loaned $63.7 million by its parent corporation, PTC, Seamless was still saddled with $195 million in debt at inception, even if it was only *an* obligor of that debt. Further, within a year and a half of incorporation, Seamless fell behind in its payments due plaintiff and within two years, filed for bankruptcy. The Court finds plaintiff's allegations regarding Seamless' capitalization, taken as true, permits a reasonable inference that support the veil-piercing factor that PTC undercapitalized Seamless.

### 2. Insolvency

"[M]ere insolvency is not enough to allow piercing the corporate veil. If creditors could enter judgments against shareholders every time that a corporation becomes unable to pay its debts as they become due, the limited liability characteristic of the corporate form would be meaningless." *Mason*, 2005 WL 1653954, at *3. Instead, "insolvency is

one factor to be considered in assessing whether the corporation engaged in conduct that unjustly shields its assets from its creditors. If so, and especially if particular shareholders benefited from and controlled that conduct, then justice would require the piercing of the corporate veil in order to hold the benefiting shareholders responsible." *Id*.

Here, plaintiff asserts that Seamless is the alter ego of PTC in part because Seamless was insolvent and unable to pay its debts as they became due. The basis of plaintiff's lawsuit is that Seamless fell behind on its payments due plaintiff, spurring PTC to pay plaintiff on Seamless' behalf. Seamless never had its own income and wholly relied upon its parent, PTC, to pay its ongoing debts and obligations – including the payment of its own employees. Further, it is uncontested that Seamless filed for bankruptcy approximately a month after Seamless disputed plaintiff's invoice and was subsequently dissolved under Delaware law. Plaintiff's allegations – that Seamless' sole shareholder, its parent corporation PTC, controlled Seamless' conduct and benefitted by that conduct and brought about Seamless' insolvency – are sufficient to permit the reasonable inference that Seamless was insolvent, at least for a time, when dealing with plaintiff.

### 3. Corporate Formalities

"Observation of appropriate formalities by those controlling a corporation is typically regarded as an important consideration because it demonstrates that those in control of a corporation treated the corporation as a distinct entity" and therefore "had a reasonable expectation that the conventional attributes of corporateness, including limited

liability, would be accorded to it." *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 989 (Del. Ch. 1987) (internal citation omitted). "When those formalities are not respected, the legal fiction of corporateness becomes less 'real' in the everyday experience of those involved in the firm's operations and any expectation that others would treat it as a distinct, liability-limiting entity becomes less reasonable." *Id.*

Plaintiff claims that the formal legal requirements of Seamless were not observed, in that Seamless' board of directors met only one time in its existence – on March 11, 2015, the same day that Seamless disputed plaintiff's invoice. Additionally, plaintiff alleges that Seamless and PTC shared offices, officers, and directors. The Court finds that plaintiff has sufficiently alleged facts that allow this Court to reasonably infer that PTC failed to maintain certain corporate formalities, supporting this veil-piercing factor.

### 4. Corporate Facade

"When a parent corporation exercises significant control over a subsidiary's operations and finances, an inference may arise that Defendants created a façade." *In re Autobacs Strauss, Inc.*, 473 B.R. 525, 558 (Bankr. D. Del. 2012). Plaintiff alleges that Seamless was a mere corporate facade of PTC because PTC controlled and directed every aspect of Seamless' business – including strategies, finances, and operations. In support, plaintiff alleges that PTC and Seamless shared directors and officers, including the same CEO and CFO. Further, plaintiff alleges that PTC incorporated Seamless as a means to protect PTC from liability for the Hopkinsville project, and Seamless acted solely for PTC's benefit. Finally, plaintiff alleges Seamless never had its own capital, income, funds, or financial responsibility to meet Seamless' obligations to those who were

contracted with it, and instead, was wholly reliant on PTC. In essence, plaintiff alleges that anyone who dealt with Seamless was actually dealing with PTC. The Court finds that plaintiff has sufficiently alleged facts that support the veil-piercing factor that Seamless was merely a corporate facade of PTC.

### 5. Element of Fraud, Injustice, or Inequity

Viewing the allegations in the light most favorable to plaintiff, plaintiff has adequately pled four factors that support its veil-piercing claim. In addition to the factors, when "assessing whether to disregard the corporate form, Delaware courts consider whether there has been a showing that the parent/subsidiary relationship would work an element of fraud, injustice, or inequity." *Fid. Nat'l Info. Services, Inc.,* 2016 WL 1650763, at *4. With respect to the element of fraud, injustice, or inequity, plaintiff alleges that PTC created, directed, and controlled Seamless in an attempt to shield PTC from liability as to its Hopkinsville project and more specifically prevented Seamless from honoring its contract with plaintiff. Moreover, plaintiff alleges that plaintiff was induced to enter into the letter agreement with PTC, although owed more than $7 million by Seamless at the time, because PTC provided its own financial statement and other documents indicating there were sufficient funds to pay plaintiff for its future work.

Taking plaintiff's allegations as true, then it has sufficiently alleged that PTC, through the use of the corporate form, may have perpetrated an element of fraud, injustice, or inequity when PTC incorporated and maintained Seamless, "an insolvent entity, and [created Seamless] as [PTC's] alter ego contracting entity and assuring [plaintiff] that it would make payments on behalf of Seamless without any intention to do

17

so, and directing [plaintiff] to continue working and spending millions of dollars after it determined not to pay [plaintiff]." (#91, pg. 17). Dismissal at this stage of the proceedings is inappropriate as to plaintiff's veil-piercing claim.

### C. Breach of Duty of Good Faith and Fair Dealing

In the first round of the motions to dismiss, this Court dismissed the count for breach of duty of good faith and fair dealing because there was no underlying contract to which the duty would attach. At that point, it was this Court's opinion that the letter agreement did not constitute a valid contract binding PTC to make future payments on behalf of Seamless. Now, having determined that the breach of contract count does state a cause of action, the merits of the good faith and fair dealing claim must be addressed. "Missouri law implies a covenant of good faith and fair dealing in every contract." *Kmak v. Am. Century Cos., Inc.*, 754 F.3d 513, 516 (8th Cir. 2014) (quoting *Farmers' Elec. Co-op., Inc. v. Mo. Dep't of Corrs.*, 977 S.W.2d 266, 271 (Mo. banc 1998)). To establish a breach of the covenant, the plaintiff must prove that the defendant exercised a judgment conferred by the express terms of the agreement in such a manner as to evade the spirit of the transaction or so as to deny the plaintiff the expected benefit of the contract. *Id*. To sufficiently plead such a breach, the plaintiff must plead that the defendant "exercised its discretion in a manner contrary to good faith and fair dealing." *Id*. at 516-17.

Here, the allegations supporting the breach of duty of good faith and fair dealing are more than ample. Indeed, the same allegations supporting the piercing the corporate veil claim are alone sufficient to support the good faith and fair dealing claim, and this Court need not review those allegations again. Additionally, in its response in opposition

to the motion to dismiss, plaintiff accurately summarizes the allegations set out in the second amended complaint as follows:

> …emails demonstrate that PTC Group and PTC Seamless concocted a plan not to pay Robinson's December 12 invoices when they became due, and intentionally concealed their plans not to pay Robinson so they could keep Robinson working for as long as possible and then "ambush" Robinson when the time for payment arrived. *Id*. ¶¶ 41, 69. On February 6, PTC Group's CEO indicated that he wanted to "start a war with Robinson to delay the invoices." *Id*. ¶ 41. Consistent with this plan and after waiting over another month, on March 11, PTC Group and Seamless presented Robinson with their trumped-up dispute over the December 12 invoices, in which they did not explain any specific dispute about any invoice or any particular amount that was in dispute. *Id*. ¶¶ 44, 49. In this fashion, PTC Group piggybacked onto a provision purporting to allow Seamless to withhold payment based upon a legitimate dispute when no real dispute existed and the payment for the invoices due on March 12 had been approved.

Again, these allegations more than ample to support the claim.

### D. Claim for Quantum Meruit

This claim, too, was dismissed in the first round of dismissal motions. The ground for dismissal was that the goods and services allegedly provided as the basis for the claim were provided not to PTC, but to Seamless, which was not then a party. "A quantum meruit claim is based upon a legally implied promise that a party will pay reasonable compensation for valuable services or materials provided at the request or with the acquiescence of that party." *Belton Wrecking & Salvage Co. v. Rohlfing*, 81 S.W.3d 703,711 (Mo. App. 2002). "The principal function of this type of implied contract is the prevention of unjust enrichment, and a claim for quantum meruit does not require the existence of an express agreement between the parties." *Id*. This Court agrees with plaintiff that the quantum meruit claim must be read in the context of the veil-piercing

19

claim. Having determined that the plaintiff has adequately alleged that Seamless was the alter ego of PTC, it follows that plaintiff's goods and services were, in effect, provided to PTC as well. Accordingly, the claim for quantum meruit will not be dismissed.

### IV. Conclusion

Plaintiff sufficiently alleges facts that preclude dismissal of any of its claims against PTC at this time.

Accordingly,

**IT IS HEREBY ORDERED** that PTC's motion to dismiss counts I, II, VI, and VII of plaintiff's second amended complaint (#81) is **DENIED**.

So ordered this 1st day of June, 2017.

_____
STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE