UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| ROBINSON MECHANICAL CONTRACTORS INC. d/b/a ROBINSON CONSTRUCTION CO., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:15-CV-77 SNLJ |
| PTC GROUP HOLDINGS CORP., and PTC SEAMLESS TUBE CORP., | ) ) ) | |
| Defendants. | ) ) | |

## **MEMORANDUM and ORDER**

On September 1, 2017, in light of the approaching September 24, 2017 trial date and the voluminous motions and briefing filed with the Court, this Court denied defendant PTC's summary judgment motion (#113) in a Docket Text Order with memorandum to follow. This memorandum accompanies that Docket Text Order and amends the September 1 Order to grant summary judgment to PTC on Counts V and VI. Summary judgment is denied on each of the remaining counts.

**I.     Background**

The following facts are undisputed except where indicated. PTC Group Holdings Corp. ("PTC") is the parent company of its wholly-owned subsidiary PTC Seamless Tube Corp. ("Seamless"). PTC created Seamless as part of a plan to build a steel pipe manufacturing plant in Hopkinsville, Kentucky. Seamless was converted from a limited liability company known as PTC Alliance Pipe Acquisition Company, LLC into a

1

corporation in 2013. In December 2012, before these companies existed, PTC executed agreements with Credit Suisse and Wells Fargo to borrow up to $195 million. Seamless would later become obligated under those agreements upon its creation.

In 2012, PTC's board authorized PTC to purchase used equipment from a Croatian plant for $6.5 million. Alliance was created for the purpose of acquiring the Croatian assets and relocating them to North America. In June 2013, Alliance was converted into a corporation, and Seamless was formed by issuing $10.00 of capital stock at $0.01 per share to PTC. Seamless became an obligor under the $195 million in debt at that point. PTC directed another subsidiary to transfer the real estate for the Hopkinsville, Kentucky plant project to Seamless. Doug Wilkins, a PTC Vice President, oversaw the Hopkinsville plant construction.

In early 2013, plaintiff Robinson Mechanical Contractors Inc. d/b/a Robinson Construction Company ("Robinson") performed removal work at the Hopkinsville facility. Robinson entered into a Professional Services Agreement ("PSA") and additional statements of work ("SOWs") with Seamless (or, initially, Alliance), through which it was agreed that Robinson would be compensated for its work on a time and materials basis. Robinson's invoices were to be paid within 30 days of issuance.

Although the parties dispute when exactly the construction project was supposed to be completed, the construction was ongoing in November 2014. At that time, PTC's Wilkins traveled to Robinson's main office in Perryville, Missouri and met with Robinson officials. Robinson's October 17 invoice for $1,749,974 was then past due. By November 30, Robinson's October 31 invoice for $2,299,579 would be past due. The

parties continued negotiating into December. Although the negotiations were complicated, PTC essentially offered to pay the due invoices, but it wanted additional time to pay and sought 90 days in which to pay all future invoices. Robinson, for its part, wanted its past-due invoices paid by the start of the year so as not to affect its credit status with lenders.

The parties began negotiating a "Letter Agreement" between PTC and Robinson as Robinson's invoices mounted. Robinson admits that its Vice President, Paul Findlay, at first wanted a formal written guaranty from PTC stating that PTC would pay Seamless's invoices. But Robinson says that PTC representatives said the parties did not have time to do that because it would require action by the PTC board. Robinson states (though PTC disagrees) that PTC Chief Financial Officer Thomas Crowley assured Robinson that PTC would stand behind the payments if Robinson agreed to extend the payment terms. The final terms of the Letter Agreement included that

> As we agreed, you released payment of $1,749,974 on Friday 12-12-14, receipt of which is hereby acknowledged and we will accept payment of the balance of $6,190,472.42 on January 2, 2015 by wire transfer in return for the concessions below. As part of this agreement we would also be willing to extend your payment terms for all invoices sent after December 1, 2014 to 90 days.
>
> We need you to understand that this extension of credit to PTC does require the commitment of a significant portion of our available line of credit for your use and that failure to pay on the part of PTC would be disastrous to Robinson Construction. As a result our offer is contingent upon the following conditions:
>
> 1) Your acknowledgement that the amount that we have agreed to postpone receipt of ($6,190,472.42) is due and payable prior to December 31, 2014 per the terms of our existing agreement, and that we have extended this credit and any future credit by way of payment terms allowed

> beyond 30 days expressly in return for the following considerations.
>
> 2) Your assurance that Robinson:
>
>> a. Will complete Phase 1 construction under the terms of our existing agreement, except as the payment terms have been modified by this agreement for invoices sent after December 1, 2014.
>>
>> b. Robinson will perform the phase 2 project for PTC on the same terms as we have executed Phase 1 (except as the payment terms have been modified by this agreement for invoices sent after December 1, 2014) if PTC elects to construct the Phase 2 portion in the next 36 months….
>
> 3) The burn rate (cost incurred per week) must be reduced effective Jan 1, 2015 to a level below $750K per week and remain at that or below that level for the duration of both phase 1 and phase 2.
>
> 4) Payments made on behalf of PTC Group Holdings Corp. and its subsidiaries, including PTC Seamless Tube Corp., are paid by PTC Group Holdings through its central cash management system. It is our intention that the payment of the remaining amount of $6,190,472.42 will be paid to Robinson Construction by wire transfer on January 2, 2015.
>
> 5) If there is any delay in payment beyond the terms agreed to above Robinson shall have the right to cease work immediately until the payments are brought back to terms.

(Letter Agreement at 1-2.) Robinson contends that Crowley replaced Robinson's request for a separate written guaranty with the condition shown in Paragraph 4, above, and that Crowley told Findlay that the language would provide the assurance Findlay needed to agree to the 90-day extension of credit. By that time (December 16), the December 12 payment had already been made, so there was only one other defined payment due (the $6,190,472.42 due on January 2). Crowley stated in his deposition that the word "payments" (plural) in that Paragraph 4 refers to that single $6 million payment, but he says he does not know why he inserted that provision.

4

Robinson's first invoice after the Letter Agreement covered work between November 23, 2014 and December 6, 2014 and was dated December 12, 2014. Under the terms of the Letter Agreement, payment was due in 90 days --- on March 12, 2015.

Robinson contends that PTC decided it would put the Hopkinsville project "on hold," but PTC allowed Robinson to continue working after making that decision. Then, Robinson claims, PTC planned to "start a war" to "delay the invoices" according to PTC's own documents.

On March 11, one day before Seamless's payment was due, Seamless sent a letter to plaintiff advising plaintiff that Seamless disputed plaintiff's invoice and that it would not make the payment. The letter did not refer to any particular invoice and did not explain what Seamless disputed within the invoice. Robinson ceased work and removed its equipment from the job site on March 12. Since then, neither Seamless nor PTC has paid Robinson for its work done after November 23, 2014. Seamless applied for bankruptcy on April 26, 2015 and was dissolved, pursuant to Delaware law, on January 29, 2016.

In the meantime, Robinson filed this lawsuit against PTC. PTC moved to dismiss plaintiff's first amended complaint for failure to state a claim. The Court partially granted PTC's motion on March 31, 2016 --- dismissing three of plaintiff's claims including breach of contract, breach of duty of good faith and fair dealing, and quantum meruit (#27). Plaintiff filed a motion to file a second amended complaint on October 31, 2016, seeking to add Seamless as a defendant, to add a new count to pierce the corporate veil between Seamless and PTC, and to reassert counts previously dismissed based upon

5

new allegations in light of facts discovered since the filing of the first amended complaint (#40). The Court granted the plaintiff's motion on January 27, 2017 (#65).

Since that time, the Court has denied PTC's subsequent motion to dismiss. Further, the Court entered default judgment against Seamless, as Seamless failed to appear or answer the second amended complaint.

PTC moved for summary judgment. Due to other pending motions and the impending trial date, the Court initially summarily denied the summary judgment motion with a memorandum to follow in a Docket Text Order (#153). For the reasons below, the Court now amends that Order.

## II. Legal Standard

Pursuant to Federal Rule of Civil Procedure 56, a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467 (1962). The burden is on the moving party. *City of Mt. Pleasant, Iowa v. Assoc. Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In ruling on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. *Buller v. Buechler*, 706 F.2d 844, 846 (8th Cir. 1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976).

**III. Discussion**

Defendant PTC seeks summary judgment on each count against it. Each is discussed in turn below.

  **A. Count I: Breach of Contract**

Robinson claims that PTC breached the Letter Agreement by refusing to pay invoices allegedly owed by Seamless. To prove breach of contract, the plaintiff must show "(1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by defendant; and (4) damages suffered by plaintiff." *Smith Flooring, Inc. v. Pennsylvania Lumbermens Mut. Ins. Co.,* 713 F.3d 933, 941 (8th Cir. 2013) (quoting *Keveney v. Missouri Military Acad.*, 304 S.W.3d 98, 104 (Mo. banc 2010)). If a contract is ambiguous, the parties may use parol evidence to determine the intent of the parties. *Bank of Kirksville v. Small*, 742 S.W.2d 127, 133 (Mo. banc 1987).

As this Court stated in its Memorandum and Order on PTC's second motion to dismiss, the Letter Agreement is ambiguous "as to the obligation to make future payments on the [Hopkinsville] project." (#103 at 10.) Although there is no express

7

promise for PTC to pay future invoices, the Letter Agreement refers to "payments" (plural) and also discusses the extension of credit "to PTC." The Court further noted that the parties had competing parol evidence: Robinson's evidence makes "clear that the intention of the parties was that PTC was to make the future payments," and PTC had "its own parol evidence showing that the intention of the parties was just the opposite." (*Id.*)

Now, the parties have filed ample briefs demonstrating just that. Although PTC picks and chooses from Paul Findlay's deposition testimony to show that there was no guaranty, the transcript in fact supports that Findlay believed the opposite. PTC contends Robinson did not act as though it believed PTC had guaranteed future invoice payments, but Robinson's evidence shows otherwise: For example, Robinson cited a February 24, 2015 email to PTC's Wilkins and Crowley noting that Robinson "provided [PTC] with a significant extension of credit" and "did this on the assurance that these payments would be made as agreed to."

A genuine dispute of material fact exists for trial as to the breach of contract claim. As a result, summary judgment is denied as to Count I.

### B. Count II: Breach of Duty of Good Faith and Fair Dealing

Robinson contends that PTC breached the implied covenant of good faith by "plan[ning] not to pay Robinson's invoice of Dec. 12, 2014 when it became due." (#47 ¶ 69.) "Missouri law implies a covenant of good faith and fair dealing in every contract." *Kmak v. Am. Cent. Cos.*, 754 F.3d 513, 516 (8th Cir. 2014) (quotations omitted). PTC argues that the Letter Agreement did not include a guaranty or promise by PTC to pay Seamless's future invoices and that, as such, PTC's conduct was consistent with the

Agreement and in no way violated the duty of good faith and fair dealing.  Because there is a dispute of fact with respect to whether a guaranty exists, however, this Court cannot grant summary judgment to PTC on Count II.

   C.   **Counts III and IV:  Fraudulent and Negligent Misrepresentation**

Robinson brings claims for fraudulent and negligent misrepresentation against PTC for PTC's inducement of Robinson to enter into the Letter Agreement.  (#47 ¶ 73, et seq.)

First, PTC contends it is entitled to summary judgment on these tort claims because they are barred by the Economic Loss Doctrine.  The economic loss doctrine bars "recovery of purely pecuniary losses in tort where the injury results from a breach of a contractual duty." *Dubinsky v. Mermart, LLC*, 595 F.3d 812, 819 (8th Cir. 2010).  "A fraud claim independent of the contract is actionable, but it must be based upon a misrepresentation that was outside of or collateral to the contract, such as many claims of fraudulent inducement." *AKA Distrib. Co. v. Whirlpool Corp.*, 137 F.3d 1083, 1086 (8th Cir. 1998).  PTC insists that Robinson can point to no actionable misrepresentation outside the contract and that, as a result, the claims are barred by the Economic Loss Doctrine.  Robinson responds that PTC furnished it with deceptive financial information regarding its ability to pay Robinson:  on December 16, 2014, PTC showed Robinson its Borrowing Base Certificate, which purported to show that PTC had a net cash availability of $23.6 million.  However, Robinson says that PTC in fact had only $12.3 million available due to a "fixed charge coverage ratio" under the terms of PTC's lending agreement.  Robinson says it never would have agreed to the 90-day payment term had it known that PTC had access to only half the cash it claimed in December.  PTC notes that

9

no one asked it about "covenants affecting PTC's maximum borrowing capacity," but that is, of course, an argument for the jury. Misrepresentations going to one party's ability to perform under a contract, so long as not actual contractual terms, do not implicate the economic loss doctrine. *See Web Innovations & Tech. Services, Inc. v. Bridges to Digital Excellence, Inc.*, 69 F. Supp. 3d 928, 933 (E.D. Mo. 2014); *Superior Edge, Inc. v. Monsanto Co.*, 44 F. Supp. 3d 890 (D. Minn. 2014) (applying Missouri law).

Robinson's claim here is distinguishable from that relied upon by PTC in *Compass Bank v. Eager Rd. Assocs.*, LLC, 922 F.Supp.2d 818 (E.D. Mo. 2013). There, the parties' contract included two conditions precedent --- a $4.15 million "Developer Settlement Payment" and a "Developer Letter of Credit" for $1.35 million. The plaintiff alleged defendants had misrepresented that they had $4.15 million in cash and could obtain a letter of credit for $1.35 million. Because those "misrepresentations" were in fact contractual terms, this Court dismissed the fraudulent inducement claim under the economic loss doctrine. Here, however, as in *Web Innovations*, the "alleged misrepresentations lack the precise nexus to the contract that was found in *Compass Bank*." 69 F. Supp. 3d at 933.

Robinson also says PTC committed fraud (or was negligent) by continuing to direct Robinson to work, spending millions of dollars in labor and materials, while concealing the fact that PTC decided in February 2015 not to pay the invoices Seamless and PTC continued to receive from Robinson every two weeks. Robinson says it would not have continued to work on the Hopkinsville project if it had been told the truth in February 2015. As a result, Robinson worked an additional month before quitting on March 12, 2015 --- the day after Seamless notified Robinson it would not pay the first

10

invoice that had just then become due under the Letter Agreement's new 90-day term. The Court is satisfied that the Economic Loss Doctrine does not bar plaintiff's claims. However, to the extent that Robinson now contends that the events of February 2015 described above constitute an ongoing fraud, the February 2015 events were not pleaded in Robinson's Second Amended Complaint, and those events do not have a sufficient connection to the November and December allegations to constitute an ongoing fraud. Although the February 2015 events are admissible on other matters, including PTC's understanding of the Letter Agreement and the alter ego claims, the connection to the November and December allegations is too tenuous to call it part of the "ongoing" fraud.

PTC also contends that it is entitled to summary judgment on the merits because "Robinson does not contend the borrowing base certificate [which showed a net cash availability of $23.6 million] was false." (#145 at 16.) Robinson does contend that the amount was materially misleading because the amount PTC actually had available was only $12.3 million, which was not enough to comfortably cover the work Robinson was tasked with over the new 90-day term.

Summary judgment is denied as to Counts III and IV.

### D. Count V: Promissory Estoppel

In Missouri, promissory estoppel permits courts "to enforce a promise on equitable grounds even if the parties have not entered into a contract." *Reitz v. Nationstar Mortg.*, 954 F. Supp. 2d 870, 889 (E.D. Mo. 2013). The elements of a promissory estoppel claim are "(1) a promise; (2) on which a party relies to his or her detriment; (3) in a way the promisor expected or should have expected; and (4) resulting in an injustice that only enforcement of the promise could cure." *Clevenger v. Oliver Ins. Agency, Inc.*, 237

11

S.W.3d 588, 590 (Mo. banc 2007). "[T]he promise element cannot be based on preliminary negotiations and discussions or an agreement to negotiate the terms of a future contract." *1861 Grp., L.L.C. v. Wild Oats Mkts., Inc.*, 728 F. Supp. 2d 1052, 1059–60 (E.D. Mo. 2010). Further, a party's reliance on the promise must be reasonable. *Blackburn v. Habitat Dev. Co.*, 57 S.W.3d 378, 387–88 (Mo. App. 2001).

Robinson argues the evidence shows that Crowley promised PTC would stand behind future invoice payments if Robinson agreed to extend the payment terms from 30 to 90 days. Robinson extended the credit in reliance on that promise, reliance was expected, and injustice resulted when Robinson was not paid for its work.

PTC, however, says there is no bona fide dispute that a contract existed between PTC and Robinson governing the duties between the two parties. PTC argues the promissory estoppel claim is barred because of that valid contract. PTC also argues that no reasonable jury could find that PTC made any guaranty in the contract. Thus, PTC says, it should be granted summary judgment on this claim for alternative relief.

Robinson concedes that a valid contract existed between PTC and Robinson. But Robinson believes that alternative theories—breach of contract and promissory estoppel—are proper because this Court found that the Letter Agreement was ambiguous (#103 at 10). Thus, the jury might find that the Letter Agreement means what Robinson contends and allow Robinson to recover under the breach of contract theory. Or the jury might find that the Letter Agreement means what PTC contends but still allow Robinson to recover under the promissory estoppel theory, based on the promise Crowley made to Findlay on the phone.

Missouri law does not permit Robinson's hypothetical. Robinson can recover under the promissory estoppel theory based only on the promise Crowley made to

12

Findlay over the phone. But this phone conversation was part of the preliminary negotiations which culminated in the Letter Agreement. So any promise Crowley made over the phone was made during preliminary negotiations. This is not allowed under Missouri law, *see 1861 Grp., L.L.C.*, 728 F. Supp. 2d at 1059–60, and Robinson cannot establish the promise element. Summary judgment is therefore granted to PTC on Count V.

### E. Count VI: Quantum Meruit

In Missouri, "[a] quantum meruit claim is based upon a legally implied promise that a party will pay reasonable compensation for valuable services or materials provided at the request or with the acquiescence of that party." *Bellon Wrecking & Salvage Co. v. Rohlfing*, 81 S.W.3d 703, 711 (Mo. App. 2002). The implied contract is meant to prevent unjust enrichment. *Id.* This quasi-contractual equitable remedy does not apply "if a 'plaintiff has entered into an express contract for the very subject matter for which he seeks recovery . . . .'" *Affordable Communities of Mo. v. Fed. Nat'l Mortg. Ass'n*, 714 F.3d 1069, 1077 (8th Cir. 2013) (quoting *Howard v. Turnbull*, 316 S.W.3d 431, 436 (Mo. App. 2010)).

Robinson alleges that it furnished valuable work and materials for the Hopkinsville plant. Seamless accepted these benefits without paying for them. Thus, Robinson claims PTC—which made the implied promise to pay—is liable under a quantum meruit theory.

13

PTC argues that the quantum meruit claim fails as a matter of law because valid contracts governed the duties between Seamless, PTC, and Robinson. Thus, PTC believes it is entitled to summary judgment.

Robinson counters that the quantum merit claim must be read in the context of the veil-piercing claim. It also argues that the existence of valid contracts is not fatal because the jury must interpret the ambiguous contract to determine its scope.

Robinson, however, entered into an express contract for the very subject matter for which it seeks recovery. Specifically, Robinson seeks damages from unpaid invoices that it sent to Seamless in connection with the work it did for Seamless. Robinson then entered into the Letter Agreement with PTC. Under the terms of the Letter Agreement, "Payments made on behalf of PTC . . . and its subsidiaries, including [Seamless], are paid by PTC . . . ." (#115-1 at 6.) Thus, Robinson claims PTC entered into an express contract for the payments made on behalf of Seamless. Exactly which payments PTC agreed to make on behalf of Seamless is disputed.

In *Affordable Communities of Missouri*, the Eighth Circuit reviewed the district court's dismissal of plaintiff's unjust enrichment claim. *Affordable Communities of Mo.*, 714 F.3d at 1077. The court held that the unjust enrichment claim was properly dismissed because "plaintiff has entered into an express contract for the very subject matter for which he seeks recovery," and "the resolution of this case depends on the district court's interpretation of the condemnation provision"—a provision the Eighth Circuit found ambiguous. *Id.* at 1076 –77.

14

Here, as Robinson points out, the jury must interpret the ambiguous contract to determine its scope; the jury must interpret "payments" as it is used in Paragraph 4 of the Letter Agreement. Like the dispute in *Affordable Communities of Missouri*, this dispute is contractual and hinges on the meaning of an ambiguous contractual provision. *See id.* at 1077. Because plaintiff "entered into an express contract for the very subject matter for which he seeks recovery," and "the resolution of this case depends on the [jury's] interpretation of ['payments']," equitable relief is unavailable. *Id.* at 1077.

Reading the quantum meruit claim in the context of the veil-piercing claim does not change the analysis—the dispute (the meaning of "payments" in the Letter Agreement) is still contractual. Quantum meruit would be appropriate if the validity of the Letter Agreement were disputed. Then, the jury could find that the Letter Agreement was not enforceable but still allow Robinson to recover under quantum meruit. But that is not the case here. The dispute over "payments" is contractual, and piercing the corporate veil would not change the nature of the dispute.[1] Thus, summary judgment is proper.

### F. Count VII: Alter Ego

As this Court observed in its June 1 memorandum denying PTC's motion to dismiss, "It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation . . . is not liable for the acts of its subsidiaries."

---

[1] If Robinson successfully pierces Seamless's veil, it can recover from PTC without succeeding in its quantum meruit claim. This Court entered default judgment against Seamless (#104). If Robinson successfully pierces the corporate veil, Seamless's liability from the default judgment will be imputed to PTC.

*U.S. v. Bestfoods*, 118 S.Ct. 1876, 1884 (1998) (internal citation omitted). "Limited liability is the rule, not the exception." *Anderson v. Abbott*, 321 U.S. 349, 362 (1944). The Court also observed, however, "that the corporate veil may be pierced and the shareholder held liable for the corporation's conduct when, *inter alia*, the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the shareholder's behalf." *Bestfoods*, 118 S.Ct. at 62.

Delaware courts consider several factors when deciding whether to disregard the corporate entity, including: (1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; and (4) "whether, in general, the company simply functioned as a facade for the dominant shareholder." *Doberstein v. G-P Indus., Inc.*, CV 9995-VCP, 2015 WL 6606484, at *4 (Del. Ch. Oct. 30, 2015) (internal quotation omitted). No single factor is dispositive, and generally there must be some combination of them, and there must be "an overall element of injustice or unfairness" present. *Id.* The injustice, or unfairness, must "be found in the defendants' use of the corporate form." *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F.Supp. 260, 269 (D. Del. 1989). *See also Doberstein*, 2015 WL 6606484, at *4 ("[the] wrongful acts must be tied to the manipulation of the corporate form in order to make veil-piercing justifiable on the grounds of equity.")

When "assessing whether to disregard the corporate form, Delaware courts consider whether there has been a showing that the parent/subsidiary relationship would work an element of fraud, injustice, or inequity." *Fid. Nat'l Info. Services, Inc. v. Plano Encryption Techs., LLC*, CV 15-777-LPS-CJB, 2016 WL 1650763, at *4 (D. Del. Apr.

25, 2016) (citing *Mason v. Network of Wilmington, Inc.*, No. CIV.A. 19434-NC, 2005 WL 1653954, at *3 (Del. Ch. July 1, 2005)). The factors are examined to determine whether "two entities appear to be legally distinct entities." *Id.* If the entities "effectively operated as one company" then "they must be treated as a single entity to avoid fraud or a miscarriage of justice." *eCommerce Inds., Inc. v. MWA Intelligence, Inc.*, CV 7471-VCP, 2013 WL 5621678, at *28 (Del. Ch. Sept. 30, 2013).

The Court held in the June 1 memorandum and order that Robinson had adequately pleaded that PTC, through the use of the corporate form, may have perpetrated an element of fraud, injustice, or inequity through its incorporation and maintenance of Seamless. PTC contends that Robinson cannot support its alter ego claim with evidence and that PTC is thus entitled to summary judgment. As shown below, each of the factors described above presents numerous questions of fact.

*Capitalization and insolvency.* PTC points out that Seamless was a newly-formed company with access to tens of millions of dollars in loans and that Robinson knew at the outset that Seamless could not generate its own revenue until the Hopkinsville plant was up and running. Further, although Seamless did file for bankruptcy, PTC points out that it had adequate sources of loans and in fact paid Robinson's invoices until PTC stepped in in December. Robinson characterizes Seamless's financial status differently and suggests that it was subject to the whims of PTC, which Robinson says was actually making all the decisions. PTC, for example, loaned Seamless $63.7 million but also saddled Seamless with $195 million in debt at its inception. Although PTC states the

17

$195 million debt is evidence of Seamless's capitalization, the nature and quantity of the debt presents a question of fact.

*Corporate formalities.* The parties dispute whether Seamless ever properly appointed directors and officers. Instead, it appears that Seamless and PTC shared offices, (purported) officers, and (purported) directors. Seamless did not hold regular "board" meetings; its first "board" meeting was two years after its incorporation and occurred the same day Seamless disputed Robinson's invoices.

*Seamless as a façade.* Robinson has set forth evidence that PTC was controlling and directing every aspect of Seamless's business, including that Seamless's business was discussed at PTC board meetings, that PTC employees controlled day-to-day operations, and that PTC and not Seamless entered into the Letter Agreement. The parties dispute whether proper formalities were made with respect to the loans between the two companies, and PTC points out that Seamless had 19 employees when it filed for bankruptcy.

*Perpetration of fraud or injustice.* Robinson contends that PTC created Seamless, obliged it to hundreds of millions of dollars in debt, and provided only the capital to pay bills that PTC chose to pay. Then, Robinson says PTC induced Robinson to extend the credit terms to 90 days and, when its CEO decided to put the Hopkinsville project on hold, the 90-day terms allegedly allowed PTC to let Robinson continue working while PTC prepared for "war" over the invoices. PTC counters that no fraud occurred: Robinson was paid $22 million for its work, and PTC itself lost $96 million as a Seamless creditor.

Ultimately, this Court must resolve factual disputes in favor of the non-moving party. *Robert Johnson Grain Co.*, 541 F.2d at 210. As this Court has stated throughout this litigation, the disputed facts are ubiquitous, and the Court cannot grant summary judgment to PTC on this record.

## IV. Conclusion

Summary judgment will be granted to defendant PTC on Counts V and VI. As such, this Court's docket text order of September 1, 2017 will be amended. Summary judgment is denied as to the remaining Counts.

Accordingly,

**IT IS HEREBY ORDERED** that this Court's September 1, 2017 order is AMENDED.

**IT IS FURTHER ORDERED** that defendant's motion for summary judgment is GRANTED in part and DENIED in part.

**IT IS FINALLY ORDERED** that summary judgment is granted to defendant PTC on Counts V and VI and denied as to all remaining counts.

Dated this __8th__ day of September, 2017.

_____
STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE